## Carroll vs. Wilson.

It is clear that a court of equity cannot take cognizance of a case purely of damages for a breach of contract in the sale of land, where there is no prayer for specific performance, nor a state of facts showing that a court of law cannot afford a complete remedy.

*Appeal from Pulaski Chancery Court.*

Hon. Hulbert F. Fairchild, Chancellor.

Garland, for the appellant.

It is admitted at once, that, as a general rule, a bill in equity for compensation merely, cannot be maintained. But where the compensation arises from a bargain and sale of land, and the vendor has placed it out of his power to comply specifically with his contract, and this is known to the vendee, and he then gets the land from another person, but not under as favorable terms as he would have done by purchasing directly from the first owner, the rule is, he may bring his bill for relief, and compel the party, who agreed to sell to him, to make up the difference in the two contracts of sale. And this is always the case, when the remedy at law is uncertain or embarrassed. Now, in this case, an account, too lengthy and complicated to be proved before a jury, is to be taken—a discovery from the defendant is essential. And, as the court of equity always prefers performance to rescission and compensation, the vendee is entitled to an opportunity of performing specifically, or showing why he does not, and this he could do only by defending against a bill, and not a law suit. *Willard's Eq.* 308; *Story's Eq. Juris.*, sec. 798; and many courts have sustained, in express language, this position: *Phillips vs. Thompson,* 1 *Johnson C. R.* 132, 150; *Parkhurst vs. Van Courtland, Ib.* 274; *Johnson vs. Glancy,* 4 *Blackford,* 94, 99; *Mialhi, vs. Lassabe,* 4 *Ala.* 713; *Anthony vs. Leftwitch,* 3 *Randolph* 238; *Payne vs. Graves,* 5 *Leigh* 561; *Andrews vs. Brown,* 3 *Cushing* 130. If the remedy at law be even doubtful or difficult, equity will hold jurisdiction. *Weymouth vs. Boyer,* 1 *Vesey, jr.* 417.

It is submitted, that, as Carroll did all he could to complete the sale—as he never, by word or act, induced Wilson to believe he had abandoned the trade—as Wilson sold the property to another, and as Carroll was forced, in consequence of such sale, in order to get the property he so much desired, to submit to harsher and more exorbitant terms than those agreed on between him and Wilson; every principle of law calls on and requires Wilson to make up the damage done Carroll, by forcing him to

such losses. The case falls directly within the ruling in *Franklin vs. Miller*, 4 *Ad. & Ell.* 599.

HEMPSTEAD, for the appellee.

It is not always easy to draw the line of distinction, in some cases, as to matters which are properly cognizable at law, and those which may become the foundation of equity jurisdiction. But now and then one arises in which the distinction is palpable—standing out like a bright star in a dark horizon.

The one we have in hand is unmistakable. No amount of reasoning, however plausible—no number of authorities, can make this whole proceeding anything but a suit for damages in a court of equity. It is a bill for damages purely—in which the avowed object is to obtain compensation for the difference between Wilson's first proposition to sell to Carroll, and the sale as actually made of the same property subsequently to Binford. No specific performance is sought—no rescission asked for; but it is purely, technically, and in fact, a bill for damages, for the alleged breach of a contract.

It needs only a glance at the bill to perceive that it is founded upon mere matters of legal cognizance. It relates to a contract, and complains of the non-performance of it, and whereby the complainant, as he alleges, was damaged; and he calls upon the defendant to make it good to him in equity.

Generally courts of chancery do not interfere at all in cases of contracts relating to personal property, either to enforce performance, or to prevent a breach, or to assess damages. See *Dugan vs. Cureton*, 1 *Ark.* 41; *Blore vs. Sutton, Mer.* 248; *Todd vs. Gee*, 17 *Ves.* 277, 279; *Gwillim vs. Stone*, 14 *Vesey*, 129; *Swainsbury vs. Jones*, 5 *Mylne & Craig*, 1, 3; *Hatch vs. Cobb*, 4 *J. C. R.* 559; *Kempshall vs. Stone*, 4 *J. C. R.* 193; 2 *Story's Eq.* 294, 296, 297, 298, 299.

The bill seeks compensation by way of damages; not incidentally, but primarily, for an alleged breach of contract. It does not ask for either the specific performance of any contract—or the rescission of any contract—or the reformation

of any contract. It alleges no fraud, and does not, indeed contain a single feature of equitable cognizance. It is founded on matters of strict legal cognizance, and certainly if the plaintiff is entitled to redress, he is bound to seek it in another forum.

Hon. THOMAS JOHNSON, Special Judge, delivered the opinion of the Court.

This was a suit instituted in the Chancery Court of Pulaski county by George W. Carroll against Emzy Wilson.

The bill charges that, about the first of November, 1854, the complainant, then a citizen of Alabama, was in the State of Arkansas, for the purpose of buying a plantation upon which to settle, that upon reaching Little Rock, he was informed, that the defendant, who resided in Conway county, owned and desired to sell a valuable plantation, upon which he then resided, that said plantation was situated on Point Remove Creek, in said county of Conway; that upon repairing to the residence of defendant, he found it to be true, that he desired to sell, but owing to the fact that he had given a man by the name of Caldwell until a certain time not yet arrived, whether or not he would take the plantation and other property, at a price agreed and stipulated between them, he and defendant could not make a positive trade for the property, but that they mutually agreed, if Caldwell did not take the property, and they could agree upon its value, the defendant first agreeing that if Caldwell, by the time specified between them, did not take the property, or he should sooner hear of his declination, that he would immediately notify the complainant thereof, and hold himself bound to him according to such terms as might be agreed upon between them; the complainant on his part agreeing if as aforesaid, he and defendant could agree as to the value of the property, and he should be notified of Caldwell's failure to take it, that he would come immediately and comply with his part of the trade; whereupon he and the defendant proceeded to

price and value the property, and the valuation of it was put in writing by a third party, and which is as follows:

Five young negro men, and one man forty-five years old, at one thousand dollars per head, amounting to six thousand dollars.

One boy fourteen years of age, valued at eight hundred dollars.

Two boys, one eleven and one nine years of age, valued at six hundred and fifty dollars per head, amounting to thirteen hundred dollars.

One girl thirteen years of age, valued at eight hundred dollars.

One young woman and child, valued at nine hundred dollars.

One woman thirty-five years of age, valued at six hundred dollars.

One woman and five children, valued at three thousand dollars, all of the negroes amounting in the aggregate to thirteen thousand dollars.

Seventy head of cattle, at seven dollars per head, amounting to four hundred and ninety dollars.

One hundred and fifty head of hogs, at one dollar per head, amounting to one hundred and fifty dollars.

Sixteen mules at sixty-five dollars per head, amounting to one thousand and forty dollars.

Two horses at fifty dollars per head, amounting to one hundred dollars.

Forty head of sheep, at one dollar and twenty-five cents per head, amounting to fifty dollars.

One wagon and three yoke of oxen, at two hundred and fifty dollars.

Two thousand bushels of corn, at one dollar per bushel, amounting to two thousand dollars.

Fodder is thrown in.

One thousand acres of land, at twenty dollars per acre, amounting to twenty thousand dollars—the entire amount being thirty-seven thousand, four hundred and eighty dollars;

And for which if he took the trade, he was to pay the defendant part cash, and the balance in yearly instalments, at six per cent. per annum on the credit notes; that after said agreement and valuation, the complainant returned to his home in Alabama, to await a hearing from the defendant, that soon after getting home he received a letter from the defendant notifying him that Caldwell had declined taking the property, and that he (the defendant) would hold himself bound unto him until the twentieth of December, thereafter, according to the terms of the trade price of the property, and taken down when with him, that said letter was dated Little Rock, Arkansas, twenty second of November, eighteen hundred and fifty four, and that said letter also stated that the defendant would want a cash payment of ten thousand dollars.

That immediately upon the receipt of the letter, he set about raising the necessary amount of money, and in a few days had raised the ten thousand dollars, and advertised all of his Alabama property, to be sold at public out cry, and started for the residence of the defendant for the purpose of being ready to comply with his part of the trade. That he reached Little Rock on the thirteenth or fourteenth of December, and in time to reach the defendant's, so as to comply with his engagement with him, but as soon as he reached Little Rock, he found that the defendant had, about the last of November, sold the entire property to one Adison Binford, of Limestone county, Alabama, thereby placing it out of his power to comply with his contract with the complainant without the interference of a court of equity.

He then exhibits a copy of the deed from the defendant to Binford for the land, and avows that there is no record of the trade between them as to the negroes and other personal property, and on this account he prays that the defendant may be required to discover and set forth on oath, in answer to the bill, every part and parcel of the trade with said Binford not incorporated in the deed exhibited.

That after being satisfied that it would be useless for him to

go to the house of defendant, he wrote to him from Little Rock, employed an attorney to attend to the matter for him in a court of equity, hurried to his home in Alabama for the purpose of countermanding the sale of his property in that State; that soon after he reached Alabama he received a letter from defendant, dated Lewisburg, Arkansas, 19th of December 1854, which purported to be in reply to one acknowledging the receipt of the complainant's letter to him written from Little Rock, and said letter expressed much regret at his acts towards complainant, and protested that every thing done by him was in good faith to complainant in the first place, and that if in his power he would be pleased to correct it, that he hoped he would confer with Binford, etc. That in consequence of said letter he concluded that if Binford could be gotten out of the way, the defendant would settle with him without the aid of the court, and in accordance with their agreement, and which was now more desirable because of his having in the first instance advertised and sold a great deal of the property necessary to carry on the Alabama plantation, and if he could even then get the trade from Binford, as he the defendant was willing to do any thing in his power to correct what had been done, it would save him from being forced at the season of the year to buy necessary articles to carry on the farm. That upon conferring with Binford, he found that there were many very material differences in the trade as made with Binford, and as made with himself, and all greatly in his favor, yet he concluded as from his letter the defendant had as alleged been imposed upon, and that he would do all in his power to correct, and that on account of the damage sustained by him in the first instance and the defendant's second letter, he was moved to trade with Binford, notwithstanding it was a much harder trade on him than the one that he had made with the defendant; whereupon he and Binford entered into a written agreement thereby closing the trade, Binford agreeing on his part that he would convey unto him the tract of land, negroes, stock, team and every thing that he had obtained from the defendant, and requiring him the com-

plainant to make arrangements immediately to meet the exchange on Memphis and New Orleans respectively which he had given the defendant in part payment of the said property, and further requiring him to substitute his individual notes instead of them, and entirely release him from any liability to the defendant on account of the said trade; all of which he agreed to do.

That he had to pay to Binford the sum of two hundred dollars, which would appear from Binford's receipt to him, which he filed, and made a part of the bill, which sum the defendant first promised to pay him, but had since refused to do so. That afterwards, he, as soon as practicable, was ready and started for the plantation, moving his Alabama property with him, that after he reached Lewisburg, he found that the defendant was not willing to release and enter satisfaction on the mortgage given him upon the land by Binford, and surrender the notes and take in lieu thereof his (the complainant's) notes for a like amount with a sufficient mortgage on negroes to secure the payment of the sum. That being thereby disabled from complying with his agreement with Binford was forced to return to Alabama, and after having further secured him, he obtained his deeds to the land and negroes; that as soon as he returned to Arkansas that he had a settlement with the defendant according to his obligations to Binford; that he requested the defendant to settle with him according to the trade made between him and himself.

He insists that the defendant is bound in equity and conscience by his agreement with him, and that he ought to settle with him according to the terms thereof, and to pay him every advantage which he had obtained by the violation of that contract. He alleges that by violating the original contract with him, and compelling him to settle according to his obligations to Binford, was very much against him and in favor of the defendant. He insists that the contract between himself and the defendant, and that entered into by the defendant and Binford, and of which latter he prayed a discovery, differs in this,

that in his contract with the defendant, he sold to him two negroes, a boy fourteen years of age, valued at eight hundred dollars, and a girl thirteen years of age valued at eight hundred dollars, and which negroes were not sold to Binford, and that he ought not to pay that sum nor the interest upon it.

That the defendant sold to him cattle at seven dollars per head, and that in his trade he charged more.

That he sold to him two horses, at fifty dollars a piece, and did not sell said horses to Binford at any price : that he sold him a wagon and three yoke of oxen, at two hundred and fifty dollars, and that he only sold to Binford two yoke of oxen and the wagon ; that in his trade with him, he agreed to throw in the fodder then on hand, and that he sold the same to Binford for a price agreed upon between them, and that all of these differences were paid by him to the advantage of the defendant, and to the disadvantage of himself.

He further insists that in his trade with him, the defendant agreed to take interest at the rate of six per cent., per annum, and in that with Binford he required eight per cent. which in the aggregate made a difference of seventeen hundred dollars.

He concludes with a prayer that all these differences in the two contracts may be considered by the chancellor, and that the defendant may be compelled by a decree of the court to do equity.

The defendant filed his answer to the bill, in which he admits that about the time alleged in the bill, the complainant was in Arkansas, for the purpose of buying a plantation, on which to settle, as he then stated; that at that time he was the legal owner of the lands, negroes and other property mentioned in the bill, and that he desired to sell the same : that said land is situated on Point Remove creek, in Conway county, in the State aforesaid, and that about the time mentioned in the bill, the complainant came to his residence, and that he then and there stated to him, that he had promised one Caldwell that he would sell said lands to him, and further that if the said Caldwell did not purchase the same by the 20th of November, 1854, or about

that time, that said estate would then be for sale to any other person that might wish to purchase it. But he positively denies that it is true, as stated, that he and the complainant proceeded to price and value said real estate, negroes and other personal property, or any part thereof, or that the prices and valuations or any part thereof, was put in writing by himself and the complainant, or by a third party, by or with his consent, and alleges that he stated to the complainant that he had for sale the land and negroes and other personal property mentioned in the bill, and that he also stated to him the prices that he asked, not only for the land, but for each of the negroes, and the other personal property, and that according to his best recollection, he saw the complainant with his pencil and paper in hand, engaged, as he supposed, in taking down the prices of said property, as they were mentioned by himself, but he avers that he did not see the contents of the memorandum made by the complainant, nor did he hear it read, after it was finished, and therefore he cannot say whether exhibit A. is a true copy or not, but he admits that the prices expressed in said exhibit, are about the same as mentioned by him at the time, as the amount that he would take for each article of property mentioned in it, if any person should desire to purchase the same. He avers that he then and there requested the complainant to go over the land and to the personal property with him, and examine the same, and see whether he would be willing to give the prices which he asked, but that he not only refused to do so, but alleged that it was unnecessary, that he had no doubt but that Caldwell would take the property. He admits that he told complainant, when speaking of selling the property, that if he sold the same he would want part cash, and the balance in yearly instalments at six per cent. per annum, but positively denies that there ever was any agreement made between him and complainant, either in writing or otherwise, in relation to the sale of said property, or any part thereof, or that he ever made any proposition to sell the same or any part thereof to him, which was accepted by him absolutely or conditionally. He avers that so far from complainant having made any such agreement, as is stated in his bill

with him in relation to said property, that he left his residence at the time mentioned in the bill, and went to that of Noah H. Badgett, in the county of Pulaski, in said State of Arkansas, and there proposed to buy of him a plantation on which to reside.

He admits that after complainant returned to his home in Alabama, and about the time stated in his bill, he wrote to him, that the said Caldwell had failed to sell his plantation, as he expected, and that therefore he could now purchase his lands, and that he was ready to close with the complainant according to the terms that he had taken down when with him, and that he would expect him to come immediately after the receipt of his letter and make the trade for the property, and that he would want ten thousand dollars down, and that he would make no further effort to sell the same, but hold himself bound to him until the 20th December, A. D. 1854, and that exhibit B. appended to the bill is a true copy of the letter written by him to the complainant. He avers that he did not write said letter in compliance with, or in pursuance of any agreement previously made by him with the complainant, in which he promised or bound himself to write to complainant, notifying him of the failure of Caldwell.

He further charges that when complainant left his residence, instead of going to the State of Alabama to wait a hearing from him, as alleged in the bill, he went directly to the house of Badgett, and there proposed purchasing a plantation on which to permanently locate himself, and therefore it was that he, on the 30th day of November, 1854, sold the property to one Addison Binford. He further states that the reason he wrote said letter, and stated therein that he would close the trade in relation to said property with the complainant according to the terms by him taken down at the time he was at his residence, was that he supposed the memorandum made by the complainant contained the prices asked by him for said property, and that by writing to him perhaps he might conclude to give those prices, if he had taken them down, and thus recol-

lected them, provided he had not made a purchase elsewhere to suit him.

He admits that he wrote to complainant on the 19th of December, in the year aforesaid, and that he expressed in said letter his regret that he had sold said land, negroes and other personal property to Binford, and that he protested therein that he had not been guilty of any intentional wrong towards the complainant, when he made said sale, because he had been informed, and believed it to be true that complainant did not design taking said property, and also that he did state, in his letter, that if it were in his power, he would be pleased to correct any error that he had committed, and that he hoped complainant would confer with Binford in relation to the matter, and that he would, as he believed, give entire satisfaction. He denies that there is anything in the letter, that would authorize the conclusion that he had injured the complainant either intentionally or otherwise, by selling the property to Binford, or that he was under any obligation to sell the same, or any part thereof to complainant, at the time of the sale to Binford: but, on the contrary, as is shown by the letter, that he never did agree to cancel the trade with him, nor to pay complainant any damages that had or might result to him if he should purchase said property.

He states that he was informed and believed, and charges it to be true, that so far from complainant having concluded, from the contents of said letter, that he would settle with him according to the agreement alleged, if he could get Binford out of the way, he, on the 2d of January, 1855, and long before the receipt of the letter, went to Binford and procured him to sell the property to him, and told him that if he did not do so, he would bring suit for the property against him and the defendant. He further charges the complainant not only threatened to sue Binford and himself, in order to induce the former to sell the property to him, but that he stated to him that he had the bond of the defendant, and that it was executed long previous to the

30th of November, 1854, and by which he had sold all of said property to him, all of which representations he charges to be false, and intended to defraud Binford, and not from a belief that defendant would compensate him for any damage, that he might claim for a non-compliance by the defendant with the alleged agreement, but he admits that the complainant, on the 3d of February, 1855, came to him and stated that he ought to pay him something for the injury he had sustained and the expenses he had incurred, whereupon he inquired of him what damages he had sustained, to which he responded, his expenses and damages were two hundred and eighty eight dollars and twenty cents, and which sum he then and there paid and exhibited his receipt for the same.

He further states that after the sale of the property by Binford to complainant, he came to him and complained that he had been injured by not getting the property before Binford purchased it, and stated that he thought he ought to have the further sum of two hundred dollars. Whereupon he paid him that additional amount in order to satisfy him, and keep down difficulties. He states that in addition to these sums of money, he delivered to him a considerable amount of farming utensils, and fodder, oats and other articles, of the value of one thousand dollars, and that afterwards he stated, that he had settled with him to his entire satisfaction.

He states that he not only sold the land mentioned in the bill, to Binford, but that he also sold him eighty acres more. He admits that there were two negroes, two old horses, one of which was dead, and one yoke of oxen, which he did not sell to Binford ; that one of said negroes was a boy fourteen years old, and worth eight hundred dollars, the other, a girl, aged twelve years, and worth the same; that the horses were worth twenty dollars each, and the oxen forty.

He states that with the exception of the eighty acre tract, the two negroes, two horses and yoke of oxen, the exhibit appended to the bill contains a correct statement of the property sold by him to Binford, and excepting other property to be mentioned.

He admits that the exhibits appended to the bill contain a full and true statement of all the particulars of the trade between himself and Binford; that he made him a bill of sale for the negroes, and other personal property, which he supposed to be in Binford's possession.

He denies that the trade by him with Binford was more advantageous to himself than the one with the complainant, as alleged. He states that he not only sold the property mentioned in said bill, with the exceptions before stated, to Binford, but that he also sold him parlor furniture, worth four hundred dollars, fifteen thousand pounds of pork, worth seven hundred and fifty dollars, two beds and furniture, worth one hundred dollars, and four bed-steads, worth eight dollars each, and eighty acres of land worth sixteen hundred dollars, for the sum of thirty-seven thousand dollars. He denies that he sold the negro boy and girl, the cattle and the two horses to the complainant, or any part of the property mentioned in the bill, but admits that he sold about seventy head of cattle to Binford for seven dollars and fifty cents per head.

He admits that he sold to Binford the wagon and two yoke of oxen, but denies that he ever sold said oxen and wagon, with one other yoke for the sum of two hundred and fifty dollars, or any other amount to the complainant, or that he ever agreed to throw in the fodder, but he admits that he might have stated to the complainant when they were talking about the trade that he would throw in the fodder to the person to whom he might sell the property. He admits that he let Binford have the fodder or a part thereof, that he does not recollect the value or amount, but denies that he agreed with complainant to take interest on the credit notes at the rate of six per cent. per annum. He admits that he might have said that he would take that rate of interest from the person who might purchase the property. He admits that he did receive the notes mentioned in the bill from Binford and that the same drew interest at the rate of eight per cent., and that after complainant had gotten said property from Binford, he refused to take his notes in lieu of Bin-

ford's, drawing six per cent., but, that as an accommodation to complainant, he delivered up the notes of Binford to him, and received his notes in lieu thereof bearing the same interest, and payable at the same time with Binford's.

He then denies the equity of the bill and demurs to the same.

*Caleb Ethrige,* the first witness introduced, testified that in the fall of 1854, both the parties told him, that they had traded, that the defendant talked to him several times about the trade, but that he had forgotten what he had said about it; that he told him he had traded land to Carroll at twenty dollars per acre, and also that he had sold him some negroes, but that he did not recollect the number or the price. That he lived with the defendant in the capacity of overseer about six years, that he had no difficulty with him, that he left him about four years before the sale or trade; that from the time he left him, he lived about nine or ten miles of him for the first three years, the next year about one mile, and that he was not conversant with his plantation and business all the time. He did not know all the negroes sold to the complainant, that were not afterwards sold to Binford; that Wilson told him that he was to get ten per cent., but afterwards told him that he had changed it, and was to get but eight on the credit notes; he does not recollect to have heard him say what interest Binford was to pay; he does not recollect that defendant ever admitted that he had acted in bad faith.

*Anderson Gordon* testified that he never heard defendant say anything about a trade with complainant before he sold to Binford; he thinks that defendant told him, after he had traded with Binford, that Carroll had offered him thirty-five thousand dollars for the whole concern; he thinks that Wilson told him he had made five thousand dollars by trading with Binford.

*Charles A. Carroll* stated that he was the son of the complainant; that he was residing in Alabama and with his father, when the letter dated 22d of November, 1854, was received by him, notifying him that he could have the property in question; that he at the same time, saw the list of prices referred to in

said letter, and the same that is marked exhibit A. of the bill; that in a few days after its receipt, the complainant advertised for sale, his Alabama real estate and perishable property; had raised the ten thousand dollars required as a cash payment on said purchase, and the complainant and himself started for the residence of the defendant for the purpose of closing the trade on the terms offered by him; that about the 14th December, 1854, the complainant and himself reached Little Rock, when they found that the property had been sold to a man by the name of Binford, by defendant; that having learned there that the trade between defendant and Binford had been consummated, they concluded it would be useless to go to the house of the defendant; that they consulted counsel, and employed them to take the proper steps in the premises, and went down the river below Little Rock to the farm of Noah H. Badgett, but failing to purchase of him, returned to Little Rock and took the first stage for the Mississippi river, the complainant hurrying back to stop the sale of his Alabama property; that he returned to Alabama, he found the second letter of the defendant awaiting complainant, they then saw Binford, and after considerable effort, he agreed that complainant should have the trade by paying him some little expense he had been at, whereupon they so soon as practicable started and moved to the property in question, in Conway county; that after being there a short time, the complainant and defendant proceeded to make a settlement, when it appeared as to the lands and negroes, no deeds having been given, but only bonds, and that defendant was not willing to release his mortgage on the land for any other kind of property, and allow the complainant to substitute his notes for Binford's according to the agreement between the complainant and Binford, and that they could only settle for the smaller items of the property, and such things as were not included in Binford's notes to the respondent, etc., and that they did settle accordingly; that whenever there was any difference between the price agreed upon by the defendant and complainant, and the defendant and Binford, the settlement was made according to

the terms of the trade as agreed upon between defendant and complainant; that defendant paid complainant all the money paid by complainant to Binford for the trade, and also paid him the money expended by him in coming to, and returning from Little Rock, and manifested every disposition to settle according to the terms of the first trade made with complainant: that he frequently spoke to defendant about it, he, the defendant, spoke of the differences in the trades, and of Binford's having deceived him, of the negroes that were sold in the first, and not in the second trade, and of the difference in the rate of interest, that he did not hear him say positively he would settle according to the terms of the first trade, but that he would do what was right, and that he never refused to settle until some months afterwards; but that in the fall of 1855, he said he had learned from his lawyer that he could not be compelled to pay any more, and that he should not do so unless compelled by law. That complainant never received the negroes referred to in the memorandum; that is to say, the boy fourteen years old valued at eight hundred dollars, and the girl thirteen valued at the same, nor did respondent sell them to Binford, as he had often heard him say, etc.

On cross-examination he stated, that he was present at the first settlement between the complainant and defendant, and that it did not embrace all matters of difference between them; that there was nothing included in that, which had been included in the settlement between defendant and Binford; that exhibit A of the answer is a correct statement of the items brought into the settlement; that $688,20 is the amount allowed complainant, that the trade made by complainant and Binford was not as good as the proposition made by defendant to him; that there were two negroes in the original trade at eight hundred dollars each, and that they had appreciated much in value, and were worth some two thousand dollars besides the value of their services, say fifty dollars a year; that there was a difference of two per centum on the credit notes and in the prices of cattle, etc., etc.

*James Childers* testified that he understood from defendant in the fall of 1854, that he had made a conditional trade with G. W. Carroll for his place and some negroes, the condition was that if a Mr. Caldwell did not take the property at thirty-seven thousand dollars that Carroll was to have it at the same price. That the reason why the trade was not closed at the time was, that defendant was waiting for an answer from Caldwell, he having the refusal of the place, and was to give defendant an answer at a certain time. That defendant reserved two negroes, Amanda and John, in the trade he made with Binford, and that they were worth about fifteen hundred dollars, and that their services from 1855 to October 1857 were worth about four hundred and five dollars.

*De Rosey Carroll* stated that he knew of a trade between the parties in October or November 1854. That it was made at the house of defendant, and that he described and priced nineteen negroes, that he was called upon to write down the same which he did, the defendant standing by and looking on, and that he proceeded in the same way to describe and price the stock, utensils, corn and 1000 acres of land, the plantation upon which he then resided. That the negroes amounted in the aggregate to thirteen thousand four hundred dollars, and to which sum the value of the stock and land being added amounted to thirty-seven thousand four hundred and eighty dollars; all of which was offered by the defendant and accepted by the complainant, who agreed to make a cash payment when he got possession, and to pay six per centum per annum on the deferred payment. That the trade thus agreed upon was not closed by the parties, because defendant said he was under obligations to wait some to hear from a Mr. Caldwell, to whom he had offered the place, and give him some time to answer propositions, but that as soon as he heard from him he would advise complainant by letter at Tuscumbia, Alabama, and it was agreed that he should take the trade, if Mr. Caldwell did not, and regretted much that he had by his promise to said

4

Caldwell placed himself in such a situation that he could not close at once.

*Addison D. Binford* testified that about the 1st of December 1854, he purchased a plantation and negroes of the defendant, that before he made said purchase the defendant told him that he had been waiting on persons who had made proposals to buy his land, and that by so doing he had not sold; that he had made a verbal contract with George W. Carroll, the complainant, to sell his plantation, but that he did not consider it binding on either side, and that he had determined to sell to the first one that offered his price, and that he proposed to sell the land to him with or without the negroes. That before he purchased of defendant, he had learned from two gentlemen that the complainant had made a purchase of land either on the White or Mississippi rivers, and that he mentioned the fact to defendant. That he bought of defendant his land and negroes, that he sold the same to complainant. That he was induced to do so from two considerations, the first was that complainant informed him, that he had purchased them of defendant previously, that he held his title bond for them, that he had met defendant on the day appointed and made him a tender of the payment according to contract, that he had filed a bill in chancery against defendant for the recovery of the same; and secondly, that he had been informed that the land was subject to overflow, and that he had a prospect of purchasing a tract on Red river that he preferred, but that he would not have sold to complainant if there had have been no other difficulty besides his claim. That there was no specific agreement between complainant and himself, about complainant's suing defendant for damages. That he understood all was settled by substituting complainant as the purchaser in his place, and with which complainant expressed himself fully satisfied, that complainant agreed to take up his notes, which he did do and paid him $200,00, that there was no condition specified, that he considered the whole matter settled, that complainant claimed nothing from defendant, that if complainant had intimated that

he intended to institute a suit against defendant on account of the sale to him, he would not have sold to complainant.

That on the 2nd of April 1853, complainant gave him a note to defendant requesting him to deliver his notes to him (the deponent) and stating that he would substitute his notes in lieu thereof, and adding that all should be right, that some time in the year previous to the time of testifying, he read a letter from Arthur Carroll, the son of complainant, in which he stated that his father wished him to permit him to use his name in a suit against defendant to recover the price of a negro woman and child included in the sale of the plantation and negroes by defendant to himself, that complainant could prove that the said woman was diseased when defendant sold her to him (the deponent) and that he knew it, and that all the expenses should be paid by complainant, that he received a letter from Thos. Nelson of Memphis to the same effect, but that he did not consider that defendant owed him any thing, that a few months after complainant delivered his notes to him, he met complainant and inquired of him how he and defendant were getting on with their business matters, and that he replied that they were getting on first rate, and that every thing had been adjusted satisfactorily to both parties. He denies that he told defendant that complainant would not return. He states that he does not know what complainant expected defendant to do, but that he did not express himself to him in any manner that led him to believe that he expected defendant to settle with him according to any contract, but the one made with him, the deponent, he complainant being substituted as he understood in his place.

*Benjamin F. Danley* testified, that sometime after the sale to Binford, the complainant went to the house of defendant, and that on his return he told him that he had arranged the matter with defendant to his full satisfaction, that defendant had acted very liberal and gentlemanly with him in the matter, and that although he had not got one negro which he was to have according to the terms of the first sale, she being a favorite servant of Mrs. Wilson, he had consented to let her go,

but that defendant had given him as much or more than the value of said slave, and that he had given him a large amount of fodder, farming utensils, plow gear, etc., etc. That in referring to the matter being arranged to his full satisfaction, he understood the complainant to mean the matter of the sale of the plantation by defendant to Binford.

*Sterling H. Tucker* testified that about the last of January 1855, the complainant returned from Alabama to Little Rock, and told him that Binford had given up the place to him; that he had acted very gentlemanly about the matter. That when the complainant visited Little Rock in December, and when he was disappointed in getting the place, in consequence of the sale to Binford, he stated that he had been at a good deal of expense and trouble, and authorized him to settle the matter with the defendant, and said he would be satisfied with a thousand dollars. That he told him defendant was an honorable man, and would do what was right, and that after complainant had taken possession of his place, and after his arrangement with Binford, and on his return to Little Rock about February 1855, he told him that he had found the defendant all that I had reported him to be, and upon being asked if he had settled his matter with defendant, said he had, and expressed himself entirely satisfied.

The first question presented upon this state of fact is, whether such a case is made as to bring it within the jurisdiction of a court of chancery. If the negative of this proposition shall turn out to be true, as a matter of course there will be an end of the investigation.

There is no pretence set up for a specific performance, but the whole scope and object of the bill is to recover the difference between the contracts as made between the defendant and complainant, and defendant and Binford. The case made, then, is purely of damages, and in the event that there is nothing to oust a court of law, it is clear that equity cannot take cognizance of it.

The rule laid down by Judge Story, in his Equity Jurispru-

dence at page 140, of his second volume, is, that courts of equity ought not to entertain bills for compensation or damages, except as incidental to other relief, where the contract is of such a nature that an adequate remedy lies at law for such compensation or damages. But where no such remedy lies at law, there a peculiar ground for the interference of courts of equity seems to exist, in order to prevent irreparable mischief, or to avoid a fraudulent advantage being taken of an injured party. Thus, where there has been a part performance of a parol contract for the purchase of lands, and the vendor has since sold the same to a *bona fide* purchaser, for a valuable consideration, without notice, in such a case, inasmuch as a decree for specific performance would be ineffectual, and the breach of the contract, being by parol, would give no remedy at law for compensation in damages, there seems to be a just foundation for the exercise of equity jurisdiction.

The supreme court of the State of New York, in the case of *Wiswall vs. McGown*, 2 *Barb.*, 270 said, " When the claim is for damages only, and in this case the plaintiffs had no other, a court of law is the only proper forum. True, a court of equity will sometimes give damages in lieu of a specific performance of a contract; but that, I conceive, is only where it has obtained jurisdiction of the cause on other grounds. When the defendant has the power to fulfil his contract when the bill is filed, but from any cause becomes unable to do so, during the pendency of the suit, or where at the time of making the decree he can perform it in part only, in either case the court having jurisdiction at first, or having the power to afford partial relief by decreeing a specific performance as far as the defendants can go, can give the plaintiff compensation by way of damages. 5 *John Ch. Rep.* 183. Some of the cases have gone further, but they are not well supported, and we are not inclined to follow them. We have looked into numerous cases, both English and American, and have not been able to find a solitary one where equity has awarded damages merely as such, and that without either a prayer for a specific perform-

ance, or setting up some state of fact which clearly showed that a court of law could not afford the party a full and complete remedy.

In this case the complainant does not claim damages as incidental to any other relief, and if the contract be by parol then there is no evidence of part performance, or that the sale to Binford was for a valuable consideration, and without notice of the complainant's rights.

Let the decree be in all things affirmed.

Mr. Justice FAIRCHILD did not sit in this case.